NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CMC FOOD, INC., a New Jersey corporation, and MICHAEL CULLEY, Individually, | Civil No. 18-8939 (KSH) (CLW) |
| *Plaintiffs*, | |
| v. | |
| MITLITSKY EGGS, LLC and RICHARD MITLITSKY, Individually, GIROUX's POULTY FARM, INC., | |
| *Defendants*. | |
| | |
| MITLITSKY EGGS, LLC, | |
| *Counterclaimant*, | |
| v. | **Opinion** |
| CMC FOOD, INC. | |
| *Counterclaim-Defendant*. | |
| | |
| MITLITSKY EGGS, LLC, | |
| *Third-Party Plaintiff*, | |
| v. | |
| GIROUX'S POULTY FARM, INC., | |
| *Third-Party Defendants*. | |

**Katharine S. Hayden, U.S.D.J.**

## I. Introduction

Plaintiffs, CMC Food Inc. ("CMC") and Michael Culley ("Culley"), sued defendants Mitlitsky Eggs, LLC ("Mitlitsky Eggs") and Richard Mitlitsky ("Mitlitsky") asserting, among other things, contract, trademark, and intentional tort claims. (D.E. 1.) Mitlitsky Eggs filed a counterclaim, which it subsequently amended, bringing four causes of action against CMC.[1] (D.E. 53.) Before the Court are Mitlitsky's motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2) (D.E. 51), and CMC's motion to dismiss the amended counterclaim pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted (D.E. 43). As set forth below, Mitlitsky's motion is denied, and CMC's is granted in part and denied in part.

## II. Background

The Court derives the following pertinent facts to the pending motions from the second amended complaint (the "SAC") and amended counterclaim, and accepts them

---

[1] Mitlitsky Eggs improperly indicated on the docket that the amended counterclaim is also brought by Mitlitsky and that Culley is also a counterclaim-defendant. A review of the amended counterclaim makes clear that Mitlitsky Eggs is the only counterclaimant and CMC is the only counterclaim-defendant.

as true for purposes of these motions. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009); *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002).[2]

CMC "is a leader in developing, manufacturing and marketing fresh shell eggs and egg products," and its "reputation for superior quality egg products has developed and expanded across multiple products and markets." (D.E. 52 ("SAC") ¶ 10.) It does business under three registered trademarks: (i) THE FARMER'S HEN®, (ii) CMC®, and (iii) 2 EGGS A DAY R OK!!® (collectively, the "CMC Marks"). (*Id.* ¶ 11.) The CMC Marks are widely recognized and promoted in the eastern United States. (*Id.* ¶ 15.) Therefore CMC "maintains strict quality control standards for all of its products." (*Id.* ¶ 17.)

In approximately 2007, plaintiffs and Mitlitsky Eggs "entered into the first of several agreements, wherein CMC, serving as a consultant, agreed to aid Mitlitsky Eggs in the sale and merchandizing of eggs to distributors and retailers." (*Id.* ¶ 20.) Subsequently, in about 2014, CMC agreed to allow Mitlitsky Eggs to distribute its products to supermarkets and retailers with the use of the CMC Marks (the "Mitlitsky-CMC Agreement"). (*Id.* ¶ 21; D.E. 53, Amended Counterclaim ("Am. Counterclaim")

_____

[2] The motions before the Court, as originally filed, were not targeted at the now operative pleadings. After Mitlitsky filed his motion to dismiss, plaintiffs filed the SAC, and after CMC filed its motion, Mitlitsky Eggs filed an answer to the SAC that incorporates the amended counterclaim. No substantive changes were made in the SAC or amended counterclaim that affect the pending motions, and the parties agree that they are ripe for decision. This opinion cites to the most recent, operative pleadings.

¶ 3.)  Plaintiffs allege that "Mitlitsky, as principal of Mitlitsky Eggs, accepted and ratified the terms of the Mitlitsky-CMC Agreement on behalf of Mitlitsky Eggs and himself." (SAC ¶ 22.)

Plaintiffs claim that in or about September 2017, CMC discovered that Mitlitsky Eggs "was selling more eggs bearing the CMC Marks than it was buying."  (*Id.* ¶ 24.) After investigating further, CMC learned that Mitlitsky Eggs was buying eggs from a third-party supplier and selling them using the CMC Marks.  (*Id.* ¶ 25.)  In other words, plaintiffs maintain that Mitlitsky Eggs was passing the third-party eggs "off to the public as genuine CMC eggs."  (*Id.*)  Plaintiffs believe that defendant Giroux's Poultry Farm, Inc. ("Giroux") was supplying Mitlitsky Eggs with the eggs that it was passing off as CMC eggs.  (*Id.* ¶ 26.)

Earlier, in about 2014, CMC and Giroux had "entered into an agreement whereby Giroux would supply Hannaford Supermarkets with an 18-pack of CMC eggs, and pay a royalty to CMC in connection with these sales" (the "Giroux-CMC Agreement").  (*Id.* ¶ 27.)  Plaintiffs contend that Giroux and Mitlitsky Eggs worked together without its knowledge or consent "to produce a second SKU of CMC eggs, one that Giroux was not authorized by CMC to sell under the Giroux-CMC Agreement." (*Id.* ¶ 29.)  Plaintiffs allege that "[u]pon information and belief, Mitlitsky and Mitlitsky Eggs were aware of CMC's relationship with Giroux and vice-versa at least as early as 2016."  (*Id.* ¶ 30.)

Plaintiffs further maintain that Mitlitsky, Mitlitsky Eggs, and Giroux used their relationships with CMC to "conceive[] of a plan wherein Mitlitsky and Mitlitsky Eggs [would] obtain CMC's egg containers bearing CMC's Marks, have the containers delivered to Giroux, [which], in turn, [would] then pack[] CMC's containers with its eggs and sell[] them such that purchasers [would be] deceived into buying what they believe[d] [were] genuine CMC egg products." (*Id.* ¶ 31.)  Plaintiffs claim that defendants charged customers a premium for those eggs. (*Id.* ¶ 32.)

Plaintiffs assert that they approached Mitlitsky and Mitlitsky Eggs around mid-January 2018 and demanded that they return all products with CMC Marks in their possession for CMC's inspection. (*Id.* ¶ 35.)  They further allege that Mitlitsky and Mitlitsky Eggs refused, and "instead attempted to 'unload' the infringing merchandise" by selling it to Bozzuto's Inc. ("Bozzuto's"), a Connecticut-based wholesaler with which CMC does business. (*Id.* ¶ 36.)  Plaintiffs maintain that Bozzuto's permitted them to inspect its warehouse where they learned that "Mitlitsky Eggs had sold its entire inventory of products bearing the CMC Marks to Bozzuto's at below-market rates for genuine CMC eggs." (*Id.* ¶ 37.)

In late January 2018, plaintiffs claim that they requested answers from Giroux regarding its involvement with Mitlitsky and Mitlitsky Eggs' alleged "scheme." (*Id.* ¶ 38.)  They maintain that Giroux (i) admitted that it "had packed and shipped egg products bearing the CMC Marks for which CMC did not receive a benefit"; and

"downplay[ed] the number of units, i.e., cartons of eggs sold in connection" with the conduct. (*Id.* ¶ 39.)

On February 2, 2018, plaintiffs contend that they informed Mitlitsky and Mitlitsky Eggs by letter that they were terminating the Mitlitsky-CMC Agreement. (*Id.* ¶ 40.) According to plaintiffs, Mitlitsky and Mitlitsky Eggs have failed to comply with that letter and have instead continued to infringe the CMC Marks. (*Id.* ¶¶ 41-42.)

In the counterclaim, Mitlitsky Eggs alleges that as result of the parties' business relationship from 2014 through February 2018, CMC obtained knowledge about (i) the identity of its clients and customers, including Bozzuto's, (ii) the identity of the buyers employed by its clients and customers, (iii) the quantity of eggs and egg products purchased by its clients and customers, (iv) the prices at which it sold eggs and egg products, and (v) "other proprietary and confidential business information." (*Id.* ¶ 6.) Mitlitsky Eggs contends that CMC wrongfully used this information to solicit business from Bozzuto's, which had been its customer for more than 20 years. (*Id.* ¶ 7.) CMC "maliciously and with [] specific intent [] disrupt[ed] the contractual relationships between" it and "its clients and customers" by "offer[ing] to sell eggs and egg products" to those clients and customers "at prices that were lower" than Mitlitsky Eggs would have offered. (*Id.* ¶ 8.) Thus Mitlitsky Eggs asserts that CMC "wrongfully us[ed] information gained from its distributor relationship" to secure business from Mitlitsky Eggs' clients and customers. (*Id.* ¶ 9.) Mitlitsky Eggs further contends that after the February 2018 termination of the Mitlitsky-CMC Agreement, CMC made "negative and

derogatory statements" to Mitlitsky Eggs clients and customers with the intent to cause them to terminate their relationships with Mitlitsky Eggs. (*Id.* ¶¶ 11-12.) As a result, Mitlitsky Eggs maintains that its clients and customers, including Bozzuto's, stopped doing business with it or "significantly reduced the volume of eggs being" purchased. (*Id.* ¶ 10.) But for that conduct, Mitlitsky Eggs contends that it would have continued to do business with those clients and customers. (*Id.* ¶ 14.)

On May 8, 2018, plaintiffs filed a complaint against Mitlitsky and Mitlitsky Eggs. (D.E. 1.) On July 5, 2018, Mitlitsky and Mitlitsky Eggs answered, Mitlitsky raised an affirmative defense for lack of personal jurisdiction, and Mitlitsky Eggs filed a counterclaim against CMC and a third-party complaint against Giroux. (D.E. 11.)

After answering on July 12, 2018, Mitlitsky filed a motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). (D.E. 14.) On August 9, 2018, CMC filed a motion to dismiss the counterclaim under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. (D.E. 23.) The Court administratively terminated CMC's motion to dismiss (D.E. 31) and granted Mitlitsky Eggs leave to file an amended counterclaim (D.E. 38), which Mitlitsky Eggs filed on November 26, 2018, asserting four claims: (Count One) tortious interference with existing economic advantage; (Count Two) tortious interference with prospective economic advantage; (Count Three) breach of the implied covenant of good faith and

fair dealing; and (Count Four) unjust enrichment (D.E. 39).[3]  CMC moved to dismiss the amended counterclaim.  (D.E. 43.)

More procedural volleys followed.  On January 30, 2019, the Court administratively terminated Mitlitsky's motion to dismiss when it granted plaintiffs leave to file an amended complaint, in which it added Giroux as a defendant.  (D.E. 47, 48, 49.)

On February 8, 2019, Mitlitsky re-filed his motion to dismiss for lack of personal jurisdiction.  (D.E. 51.)  Plaintiffs filed the SAC on February 22, 2019.  (SAC.)  Mitlitsky Eggs answered the SAC, and reasserted its amended counterclaim and third-party claim on February 25, 2019.  (D.E. 53.)  Mitlitsky did not join in Mitlitsky Eggs' answer, but he did reassert his affirmative defense for lack of personal jurisdiction.  (*Id.*, Second Affirmative Defense.)

## III.  Discussion

### A.  Mitlitsky's Motion to Dismiss for Lack of Personal Jurisdiction

#### 1.  Standard of Review

Pursuant to Fed. R. Civ. P. 12(b)(2), a party may move to dismiss for lack of personal jurisdiction.  In deciding, a court "'must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff.'"  *Pinker*, 292 F.3d at 368 (quoting *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992)).

---

[3] The Court adopts CMC's characterizations of the causes of action in the amended counterclaim because Mitlitsky Eggs does not specify the claim each count purports to bring and does not dispute CMC's characterizations.

Nevertheless, the plaintiff bears "the burden of demonstrating facts that established [a *prima facie* case of] personal jurisdiction." *Fatouros v. Lambrakis*, 627 F. App'x 84, 86–87 (3d Cir. 2015); *see also Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 94 (3d Cir. 2004) ("To defeat Appellee's motion to dismiss for lack of personal jurisdiction, [plaintiff] was required to present a prima facie case that jurisdiction existed."). To sustain that burden, "a plaintiff must establish jurisdictional facts 'through sworn affidavits and competent evidence. . . . At no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. Once the motion is made, plaintiff must respond with actual proofs, not mere allegations.'" *Benitez v. JMC Recycling Sys., Ltd.*, 97 F. Supp. 3d 576, 581 (D.N.J. 2015) (Irenas, J.) (alteration in original) (citation and internal quotation marks omitted) (quoting *Machulsky v. Hall*, 210 F. Supp. 2d 531, 537 (D.N.J. 2002) (Brotman, J.)).[4]

---

[4] As an initial matter, plaintiffs argue that Mitlitsky waived his right to move to dismiss for lack of personal jurisdiction because he answered the original complaint before filing this motion. Fed. R. Civ. P. 12(b) provides that a motion to dismiss for lack of personal jurisdiction "must be made before pleading if a responsive pleading is allowed." *See also* Fed. R. Civ. P. 12(h) (requiring a party to assert the defense of lack of personal jurisdiction at the first opportunity). As Mitlitsky notes, some courts in this District have permitted defendants to file a motion to dismiss for lack of personal jurisdiction after filing an answer so long as the defendant raised it as an affirmative defense in that pleading. *See, e.g., Benitez*, 97 F. Supp. 3d at 580 n.3 ("[T]he Court notes that JMC filed the instant motion to dismiss after answering the Complaint, despite the requirement that motions pursuant to Rule 12(b) be made 'before pleading if a responsive pleading is allowed.' Fed. R. Civ. P. 12(b). However, courts in the Third Circuit have generally been unwilling to deny such motions as untimely when a defendant included the same grounds as an affirmative defense in its answer."); *Database Am., Inc. v. Bellsouth Advert. & Pub. Corp.*, 825 F. Supp. 1195, 1215 n.36 (D.N.J. 1993) (Lechner, J.) ("BAPCO preserved the defense of lack of personal jurisdiction in its answer. Accordingly, under

## 2.    The Court May Exercise Personal Jurisdiction Over Mitlitsky

Pursuant to Fed. R. Civ. P. 4(e), "a district court may exercise personal jurisdiction according to the law of the state where it sits. 'New Jersey's long-arm statute provides for jurisdiction coextensive with the due process requirements of the United States Constitution.'" *Malek v. Chef's Roll, Inc.*, No. 18-3205, 2019 WL 3854303, at *3 (D.N.J. Aug. 16, 2019) (Martinotti, J.) (quoting *Miller Yacht Sales*, 384 F.3d at 96). Accordingly, under New Jersey's long-arm statute, a court's personal jurisdiction is only constrained "by 'traditional notions of fair play and substantial justice,' inhering in the Due Process Clause of the Constitution." *Carteret*, 954 F.2d at 145 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Plaintiffs do not argue that this Court has general jurisdiction over Mitlitsky[5]; they only contend that this Court may exercise specific jurisdiction. Whether a court may exercise specific jurisdiction over a defendant involves a three-part inquiry. In *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312 (3d Cir. 2007), the Third Circuit described that test as follows:

> First, the defendant must have "purposefully directed [its] activities" at the forum. *Burger King Corp. v. Rudzewicz*, 471

_____

Fed. R. Civ. 12(h)(1), BAPCO has not waived this defense and could bring a follow-up motion to dismiss for lack of personal jurisdiction." (citation omitted)). The Court need not resolve whether Mitlitsky waived his right to bring a motion under Fed. R. Civ. P. 12(b)(2) because, as discussed below, Mitlitsky is subject to personal jurisdiction in New Jersey on all of plaintiffs' claims.

[5] "'[G]eneral' or 'all purpose' jurisdiction . . . permits a court to assert jurisdiction over a defendant based on a forum connection unrelated to the underlying suit (e.g., domicile)." *Walden v. Fiore*, 571 U.S. 277, 284 n.6 (2014).

U.S. 462, 472, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985) (quotation marks omitted). Second, the litigation must "arise out of or relate to" at least one of those activities. *Helicopteros*, 466 U.S. at 414, 104 S. Ct. 1868; *Grimes v. Vitalink Commc'ns Corp.*, 17 F.3d 1553, 1559 (3d Cir.1994). And third, if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise "comport[s] with 'fair play and substantial justice.'" *Burger King*, 471 U.S. at 476, 105 S. Ct. 2174 (quoting *Int'l Shoe*, 326 U.S. at 320, 66 S. Ct. 154).

*Id.* at 317 (alterations in original). "Such a determination is claim specific because a conclusion that the District Court has personal jurisdiction over one" defendant as to a particular claim asserted by plaintiff "does not necessarily mean that it has personal jurisdiction over that same defendant" as to other claims. *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001).

### a. Mitlitsky is Subject to Personal Jurisdiction in New Jersey on Plaintiffs' Contract Claims

In Counts Two and Three, plaintiffs bring claims against Mitlitsky for breach of the Mitlitsky-CMC Agreement[6] and breach of the covenant of good faith and fair dealing implied within that contract.[7] (SAC ¶¶ 69-81.) "In deciding whether personal jurisdiction is present in a contract claim, the court considers 'the totality of the

---

[6] The Court finds it hard to believe that Mitlitsky is an individual party to the Mitlitsky-CMC Agreement. The SAC, however, alleges that "Mitlitsky, as principal of Mitlitsky Eggs, accepted and ratified the terms of the Mitlitsky-CMC Agreement on behalf of Mitlitsky Eggs *and himself*" (SAC ¶ 22 (emphasis added)), and on this motion to dismiss, the Court must accept those alleged facts as true, *Pinker*, 292 F.3d at 368.

[7] The Court assumes that plaintiffs do not bring Counts Two and Three against Mitlitsky as they relate to the Giroux-CMC Agreement because the SAC does not allege that Mitlitsky is a party to that contract.

circumstances, including the location and character of the contract negotiations, the terms of the contract, and the parties' actual course of dealing.'" *Cornish v. Morris Comm'ns Co., LLC*, No. 08-6395, 2009 WL 2169046, at *4 (D.N.J. July 16, 2009) (Cooper, J.) (quoting *Remick*, 238 F.3d at 256). Generally, personal jurisdiction over a non-resident defendant is appropriate when the contract is "of a long term, ongoing nature, rather than a one-time occurrence or single transaction." *On-Time Staffing, LLC v. Flexible Staffing Sols., Inc.*, No. 06-3951, 2007 WL 1234978, at *4 (D.N.J. Apr. 25, 2007) (Kugler, J.).

Taking the facts as alleged in the SAC as true, the Court finds that it has personal jurisdiction over Mitlitsky on the contract claims. Plaintiffs contend that in approximately 2014, Mitlitsky ratified the Mitlitsky-CMC Agreement on behalf of Mitlitsky Eggs and himself (SAC ¶ 22), pursuant to which Mitlitsky Eggs would purchase CMC egg products, distribute them to supermarkets and other retailers, and use CMC's Marks in connection those transactions (*id.* ¶ 21). Some of those transactions allegedly occurred in New Jersey. (*See id.* ¶ 7 (alleging that the "purchase, sale and delivery of counterfeit goods" occurred in New Jersey).) Individual plaintiff Culley, fulfilled his responsibility under Fed. R. Civ. P. 12(b)(2) in a declaration in opposition to Mitlitsky's motion to dismiss, *see Benitez, Ltd.*, 97 F. Supp. 3d at 581 (a plaintiff must come forth with actual proofs in opposition to a motion to dismiss under Fed. R. Civ. P. 12(b)(2)), which states that in furtherance of this contractual relationship, (i) he and Mitlitsky had business-related phone calls that Mitlitsky initiated (D.E. 54-1

¶ 7); (ii) Mitlitsky visited CMC's facilities in Clark and Elizabeth, New Jersey in 2014 and 2016, respectively (*id.* ¶¶ 10-11); and (iii) he and Mitlitsky met to discuss business "at different locations in the tri-state area, including New Jersey" (*id.* ¶ 13).[8]  In short the SAC alleges that Mitlitsky purposefully reached out to New Jersey citizens (CMC and Culley) to purchase CMC egg products and distributed those products using the CMC Marks in New Jersey and engaged in communications with plaintiffs about his business dealings with them.  That this conduct took place over years demonstrates that Mitlitsky purposely directed his activities—which are at the heart of plaintiffs' contract claims—at New Jersey, such that it would not offend the typical notions of fair play and substantial justice to hale him into court in this jurisdiction.  *See Urich v. J. Gordon & Co.*, No. 14-5490, 2015 WL 758555, at *4 (D.N.J. Feb. 23, 2015) (Hochberg, J.) (noting that a court could exercise personal jurisdiction over a defendant on a contract claim where it had "continued extensive communications with the Plaintiff" in forum state).

For the foregoing reasons, the Court finds that it may exercise personal jurisdiction over Mitlitsky on Counts Two and Three of the SAC.

---

[8] Mitlitsky denies none of these facts.  Rather, in his certification submitted in support of his motion, he maintains that he has not personally—as a non-Mitlitsky Eggs representative—availed himself of New Jersey.  (*See generally* D.E. 51-2.)

**b.** **Mitlitsky is Subject to Personal Jurisdiction in New Jersey on Plaintiffs' Tort Claims**

In Counts One and Four through Sixteen, plaintiffs assert intentional tort claims against Mitlitsky.[9] Courts determining whether they may exercise specific jurisdiction over a non-resident defendant alleged to have committed an intentional tort that caused harm in another jurisdiction rely on the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984)—the origin of the *Calder* "effects test." In the Third Circuit, that test requires the plaintiff to show:

> (1) The defendant committed an intentional tort;
>
> (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort;
>
> (3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

*IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 265–66 (3d Cir. 1998) (footnote omitted).

Here, all three of prongs of the *Calder* effects test are satisfied.

---

[9] Specifically, those claims are (Count One) defamation and commercial disparagement; (Count Four) unjust enrichment; (Counts Five to Seven) trademark infringement, 15 U.S.C. § 1114; (Count Eight) trademark counterfeiting, 15 U.S.C. § 1114; (Count Nine) false designation of origin and false advertising, 15 U.S.C. § 1125(a)(1)(B); (Count Ten) unfair competition, 15 U.S.C. § 1125(a)(1)(A); (Count Eleven) common law unfair competition; (Count Twelve) unfair competition, N.J.S.A. 56:4-1 *et seq.*; (Count Thirteen) tortious interference with contractual relations; (Count Fourteen) tortious interference with prospective economic advantage; (Count Fifteen) civil conspiracy; and (Count Sixteen) violations of the Defend Trade Secrets Act, 18 U.S.C. § 1839 *et seq.*

First, there is no doubt that plaintiffs allege that Mitlitsky committed intentional torts. Second, plaintiffs felt the brunt of the harm of Mitlitsky's alleged conduct in New Jersey such that it is the focal point of the harm it suffered. Specifically, plaintiffs claim that Mitlitsky made and directed the issuance of defamatory statements in the course of commercial conduct that was centered on New Jersey (SAC ¶ 2, 66), and participated in the "purchase, sale and delivery of counterfeit goods" in New Jersey, which infringed the CMC Marks (*id.* ¶ 2). They allege that he interfered with plaintiffs' contractual and prospective business relationships by making defamatory statements about CMC—a New Jersey corporation with its principal place of business in the state (*id.* ¶¶ 1, 148-60), conspired to injure CMC by infringing the CMC Marks in New Jersey (*id.* ¶¶ 7, 161-64), and compromised the trade secrets of CMC (*id.* ¶¶ 165-75).[10] In other words, Mitlitsky's alleged tortious conduct is claimed to have had a significant impact on plaintiffs in this jurisdiction. Indeed, for trademark infringement, which underlies plaintiffs' causes of action against Mitlitsky, "[t]he law is clear that the forum may exercise personal jurisdiction over the defendant where he is shown to have sold the allegedly infringing product in the forum state." *Gentex Corp. v. Abbott*, 978 F. Supp. 2d 391, 398 (M.D. Pa. 2013); *see also TriStrata Tech., Inc. v. Emulgen Labs., Inc.*, 537 F. Supp. 2d 635, 640-42 (D. Del. 2008) (concluding that the sale of an infringing product to four residents, which constituted less than 1% of defendant's business, was sufficient to

---

[10] Paragraphs 173-75 of the SAC are incorrectly numbered 101-03.

establish personal jurisdiction over defendant).   Third, Mitlitsky expressly aimed his purported tortious conduct at New Jersey by engaging in business with New Jersey plaintiffs, communicating with and visiting them, and purchasing, selling, and delivering infringing CMC products in the state.

Thus the Court has personal jurisdiction over Mitlitsky on plaintiffs' tort claims in Counts One and Four through Sixteen.

c.     **<u>Mitlitsky's Corporate Position Does Not Deprive the Court of Personal Jurisdiction</u>**

In his reply brief Mitlitsky argues that a court does not have personal jurisdiction over an individual defendant when his only contacts with the forum are made in his corporate capacity.  (D.E. 55 at 3-8.)  As a general proposition that is correct.  *See Norben Imp. Corp. v. Metro. Plant & Flower Corp.*, No. 05-54, 2005 WL 1677479, at *5 (D.N.J. July 15, 2005) (Lifland, J.) ("As a general rule, an individual whose contacts with the forum state are in his corporate capacity does not thereby become subject to jurisdiction in his individual capacity."); *United Prod. Corp. v. Admiral Tool & Mfg. Co.*, 122 F. Supp. 2d 560, 562 (E.D. Pa. 2000) ("In general, a court does not have personal jurisdiction over an individual defendant whose only contacts with the forum state were taken in his or her corporate capacity.").  But it is well settled that "[a] corporate officer is individually liable for the torts he personally commits and cannot shield himself behind a corporation when he is an actual participant in the tort." *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978); *see also Nat'l Precast Crypt Co. v. Dy-Core of Pennsylvania,*

*Inc.*, 785 F. Supp. 1186, 1191 (W.D. Pa. 1992) ("Accordingly, if the corporate officer engages in tortious conduct in his/her corporate capacity in the forum, courts will consider this conduct as contact with the forum sufficient to support a finding of personal jurisdiction over the officer in his/her individual capacity."). This principle has been expressly recognized to extend to infringement and unfair competition claims. *See Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 160 (3d Cir. 1984) ("An officer or director of a corporation who knowingly participates in the infringement can be held personally liable, jointly and severally, with the corporate defendant."); *Donsco, Inc.*, 587 F.2d at 606 (holding that a corporate officer could be individually liable for unfair competition and false advertising).

Here, plaintiffs contend that Mitlitsky committed the torts personally by stating that the alleged acts underlying those torts were undertaken by "Mitlitsky and Mitlitsky Eggs." (*See, e.g.*, SAC ¶¶ 36, 38, 42, 49-51, 53-56, 61.) More critically, plaintiffs maintain that Mitlitsky controlled Mitlitsky Eggs by asserting that he, "as the principal of Mitlitsky Eggs, [] a closely-held corporation, is . . . personally involved in the infringing and unlawful conduct . . . , is aware of it or should be aware of it." (*Id.* ¶ 48.)

Based on those allegations, the Court may exercise personal jurisdiction over Mitlitsky despite his acting in his corporate capacity. Indeed, the Court in *Abbott* found that it had personal jurisdiction over a corporate officer on a similar set of facts.

> [N]o such level of specificity is required to state a claim
> against Abbott for participating in the causes of action
> alleged: trademark infringement, unfair competition, and

unjust enrichment. To plead a case against a corporate officer requires only such allegations that show he participated in the wrongful acts. *See Beistle*, 914 F. Supp. at 96 (citing *Maleski*, 653 A.2d at 62–63). Allegations that Abbott advertises, manufactures and offers to sell the allegedly infringing products are sufficient to state that he participated in such conduct. *See Donsco*, 587 F.2d at 606 (noting that authorizing and approving acts of unfair competition constitute actual participation).

Finally, with or without Helicopter Helmet's name in the text of the complaint, Plaintiff still states a plausible claim against Defendant Abbott for trademark infringement, unfair competition and unjust enrichment. *See, e.g., Donsco*, 587 F.2d at 606; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 663, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The addition of Helicopter Helmet to the allegations does not change Abbott's liability. *See Donsco*, 587 F.2d at 606.

978 F. Supp. 2d at 403–04.

Thus the Court finds that Mitlitsky is subject to personal jurisdiction on all of plaintiffs' claims.

**B.  CMC's Motion to Dismiss the Amended Counterclaim**

**1.  Standard of Review**

In order for a pleading to survive dismissal under Fed. R. Civ. P. 12(b)(6), it must put forth sufficient facts to show "that the claim is facially plausible." *Fowler*, 578 F.3d at 210. "[W]hen the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" a claim will survive a motion to dismiss, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), but a pleading

containing only "conclusory or 'bare bones' allegations will" not, *Fowler*, 578 F.3d at 210.

In reviewing a motion to dismiss, the court "must accept all of the [pleading's] well-pleaded facts as true, but may disregard legal conclusions." *Id.* at 210-11. "[A] [pleading] must do more than allege the plaintiff's entitlement to relief. [It] has to 'show' such an entitlement with its facts." *Id.* at 211. The facts need not show a probability of relief; they need only show a plausibility of relief. *Iqbal*, 556 U.S. at 678.

## 2. Counts One and Two: Tortious Interference with Existing and Prospective Economic Advantage

Under New Jersey law, to state a claim for tortious interference with existing or prospective economic advantage, a party must allege:

> (1) an existing or reasonable expectation of economic benefit or advantage; (2) the defendant's knowledge of that expectancy; (3) the defendant's wrongful, intentional interference with that expectancy; (4) the reasonable probability that the claimant would have received the anticipated economic benefit in the absence of the defendant's interference; and (5) damages resulting from the defendant's interference.

*Pactiv Corp. v. Perk-Up, Inc.*, No. 08-5072, 2009 WL 2568105, at *11 (D.N.J. Aug. 18, 2009) (Cavanaugh, J.) (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1167 (3d Cir. 1993)).[11] The protectable right need not be a contract, but "there must be allegations

---

[11] The requirements for tortious interference with economic advantage and contract "are identical except that the tortious interference with contractual relations claim requires proof of an existing contract." *Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.*, 256 F. Supp. 2d 249, 288 (D.N.J. 2003) (Greenaway, J.).

of fact giving rise to some reasonable expectation of economic advantage." *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 751 (1989) (citation and internal quotation marks omitted). If that protectable right is a contract, a claim for tortious interference will survive a motion to dismiss so long as "a plaintiff alleges the existence of a contract," even if it "does not plead specific facts identifying it." *IDT Corp. v. Unlimited Recharge, Inc.*, No. 11-4992, 2012 WL 4050298, at *9 (D.N.J. Sept. 13, 2012) (Salas, J.).

Nevertheless, "a plaintiff must do more than assert that it lost business. Rather it 'must allege facts that show an existing or prospective economic or contractual relationship' for a 'mere allegation of lost business does not suffice.'" *Advanced Oral Techs., L.L.C. v. Nutrex Research, Inc.*, No. 10-5303, 2011 WL 1080204, at *4 (D.N.J. Mar. 21, 2011) (Debevoise, J.) (quoting *Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 494 (D.N.J. 1998) (Greenaway, J.)). Accordingly, "'the claimed loss of . . . unknown customers cannot, standing alone, state a claim for tortious interference with prospective business relations.'" *Harmon v. Borough of Belmar*, No. 17-2437, 2018 WL 6068216, at *8 (D.N.J. Nov. 20, 2018) (Sheridan, J.) (alteration in original) (citation and internal quotation marks omitted) (quoting *Roussel Corp.*, 23 F. Supp. 2d at 494).[12]

---

[12] Mitlitsky Eggs cites a line of cases in which courts have stated that a plaintiff need not identify specific customers or lost business opportunities to plead a claim for tortious interference. *See, e.g., Teva Pharm. Indus., Ltd. v. Apotex, Inc.*, No. 07-5514, 2008 WL 3413862, at *9 (D.N.J. Aug. 8, 2008) (Brown, J.) ("This Court agrees with those recent opinions from this District that conclude that Rule 8(a) does not require a party to identify a specific prospective customer or contract."); *Slim CD, Inc. v. Heartland*

20

CMC argues that Mitlitsky Eggs fails to state claims for tortious interference with existing or prospective economic advantage in Counts One and Two of the amended counterclaim because it does not identify any actual or potential customers it lost as a result of its alleged conduct. CMC also contends that Count One is deficient because Mitlitsky Eggs fails to identify any contract or purchase order between it and Bozzuto's or any other customers with which CMC interfered.[13] Mitlitsky Eggs counters that it pleads viable claims in Counts One and Two because it identifies Bozzuto's as a customer and it is not required to identify every customer or every lost business opportunity to support of those claims.

---

*Payment Sys., Inc.*, No. 06-2256, 2007 WL 2459349, at *4 (D.N.J. Aug. 24, 2007) (Wolfson, J.) (declining to dismiss a tortious interference claim on the ground that plaintiff did not identify a specific prospective economic advantage with which defendant interfered); *Syncsort Inc. v. Innovative Routines Int'l, Inc.*, No. 04-3623, 2005 WL 1076043, at *12 (D.N.J. May 6, 2005) (Walls, J.) (concluding that plaintiff need not identify specific prospective customers or contracts to plead a viable claim for tortious interference); *Floorgraphics, Inc. v. New Am. Mktg. In-Store Servs.*, Inc., No. 04-3500, 2006 WL 2846268, at *6 (D.N.J. Sept. 29, 2006) (Thompson, J.) (explaining that it is not necessary for a plaintiff bringing a claim for tortious interference to specifically identify lost business opportunities). The Court is not persuaded by these decisions because they were rendered before the Supreme Court clarified the level of specificity required under Fed. R. Civ. P. 8(a) in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Iqbal*, which "caused a sea change in the pleading practices in federal court," *Tyco Fire Prod. LP v. Victaulic Co.*, 777 F. Supp. 2d 893, 895 (E.D. Pa. 2011).

[13] CMC further maintains that Mitlitsky Eggs fails to state claims in Counts Two through Four because they contain only a few conclusory factual allegations. While the factual content of Counts Two through Four is spare, those Counts incorporate the factual allegations of Count One. (*See, e.g.*, Am. Counterclaim ¶ 16 ("Mitlitsky Eggs, LLC repeats and realleges each and every allegation set forth in paragraphs 1 through 15.").)

Construed as true and in a light most favorable to Mitlitsky Eggs, the Court finds the allegations sufficiently plead claims for tortious interference in Counts One and Two. Mitlitsky Eggs alleges that it had existing and reasonable expectations of economic benefit, including contractual expectations, from its customers and clients. (*See* Am. Counterclaim ¶ 6 (maintaining that Mitlitsky Eggs had customers that purchased certain quantities of eggs at certain prices).) It further asserts that CMC knew of these expectations through the Mitlitsky-CMC Agreement. (*See id.* (claiming that CMC learned confidential and proprietary information related to Mitlitsky Eggs' customers during the parties' distributor relationship).) CMC wrongfully interfered with its customer relationships by using Mitlitsky Eggs' proprietary and confidential information and making derogatory comments to its customers to obtain their business. (*Id.* ¶¶ 7-9, 11-12.) Last, Mitlitsky Eggs maintains it lost expected business from those customers because they terminated their relationship with Mitlitsky Eggs or began purchasing a reduced volume of eggs. (*Id.* ¶¶ 10, 14.) Those allegations are sufficient to state a cause of action for tortious interference with existing or prospective economic advantage. *See IDT Corp.*, 2012 WL 4050298, at *9-11 (finding that allegations that defendants used proprietary information and defamatory statements to lure away plaintiff's customers were adequate to plead a claim for tortious interference). Mitlitsky Eggs only identifies one customer—Bozzuto's—but a plaintiff need not identify multiple lost business opportunities to establish a cause of action for tortious interference. *See Am. Millennium Ins. Co. v. First Keystone Risk Retention Grp., Inc.*, 332 F.

App'x 787, 790 (3d Cir. 2009) (indicating that to state a claim for tortious interference under New Jersey law a plaintiff must identify at least a "single, specific customer" that it lost or could have acquired); *IDT Corp.*, 2012 WL 4050298, at *9 (finding that the first prong for a tortious interference with contract claim was satisfied where plaintiff identified one customer). Thus the Court denies CMC's motion to dismiss Counts One and Two of the amended counterclaim.

### 3. Count Three: Breach of the Implied Covenant of Good Faith and Fair Dealing

"A covenant of good faith and fair dealing is implied in every contract in New Jersey." *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 244 (2001). That covenant demands that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; in other words, in every contract there exists an implied covenant of good faith and fair dealing." *Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 420 (1997) (citation and internal quotation marks omitted). "To establish a claim for breach of the covenant, the claimant must allege conduct by the opposing party which 'destroyed [the claimant]'s reasonable expectations and right to receive the fruits of the contract.'" *Soma Labs, Inc. v. Shah*, No. A-4685-16, 2019 WL 2079117, at *9 (App. Div. May 13, 2019) (alteration in original) (quoting *Sons of Thunder*, 148 N.J. at 425)).

CMC argues that Mitlitsky Eggs fails to state a claim for breach of the implied covenant of good faith and fair dealing in Count Three of the amended counterclaim

because it does not allege how CMC acted in bad faith or deprived Mitlitsky Eggs of the benefits of any contract.

Drawing all reasonable inferences in favor of Mitlitsky Eggs, the Court interprets the allegations in the amended counterclaim to state that CMC's performance under the Mitlitsky-CMC Agreement was used as a pretext to gain confidential and proprietary information regarding Mitlitsky Eggs' business and thereby solicit Mitlitsky Eggs' customers, such as Bozzuto's. (*See* Am. Counterclaim ¶ 6 (maintaining that CMC acquired Mitlitsky Eggs' confidential and proprietary customer information through the Mitlitsky-CMC Agreement).) Mitlitsky Eggs asserts that CMC then terminated the Mitlitsky-CMC Agreement in bad faith to poach business from its existing and protentional customers with the confidential and proprietary information it gained. (*Id.* ¶ 8 (claiming that CMC used Mitlitsky Eggs' confidential and proprietary information to solicit Mitlitsky Eggs' customers and clients).) Those allegations taken as true sufficiently state a plausible claim for breach of the implied covenant of good faith and fair dealing.[14] *See River W. Meeting Assocs., Inc. v. Avaya, Inc.*, No. 03-1023, 2004 WL 422683, at *3 (N.D. Ill. Mar. 4, 2004) (suggesting under New Jersey law, that taking steps to compete with a contractual partner prior to terminating the contract constitutes a breach of the implied covenant of good faith and fair dealing); *Sons of Thunder*, 148 N.J. at 421 ("The obligation to perform in good faith exists in every contract, including

---

[14] The Court assumes that CMC had the unilateral right to terminate the Mitlitsky-CMC Agreement because Mitlitsky Eggs is not pursuing a claim for breach of contract.

those contracts that contain express and unambiguous provisions permitting either party to terminate the contract without cause."); *Winks/Krug Landscaping Servs., LLC v. Stonebridge at Wayne Homeowners Ass'n, Inc.*, No. 3220-15, 2017 WL 3611597, at *4 (App. Div. Aug. 23, 2017) (indicating that a breach of the implied covenant of good faith and fair dealing relating to the termination of a contract must show that the decision to terminate was done with a bad motive); *Defino v. Wachovia Bank*, No. A-5836-12, 2015 WL 4770610, at *6 (App. Div. Aug. 14, 2015) ("The party terminating the contract has an obligation of good faith performance up until its right of termination was actually effective." (citation and internal quotation marks omitted)). Accordingly, the Court denies CMC's motion to dismiss insofar as it relates to Count Three of the amended counterclaim.

### 4.    Count Four: Unjust Enrichment

"To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994). "More specifically, a plaintiff must 'show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights.'" *Equiom (Isle of Man) Ltd. v. Jacobs*, No. 16-4362, 2017 WL 6550481, at *4 (D.N.J. Dec. 22, 2017) (Cecchi, J.) (quoting *VRG Corp.*, 135 N.J. at 554).

Mitlitsky Eggs alleges in Count Four of the amended counterclaim that CMC was "unjustly enriched by the efforts of Defendant Mitlitsky Eggs introducing [CMC] to its clients and customers and by [CMC's] tortious interference with the [its] prospective economic advantage." (Am. Counterclaim ¶ 24). But, as CMC notes, the amended counterclaim is silent regarding whether Mitlitsky Eggs expected remuneration for introducing CMC to its customers. Thus Count Four fails to state a claim upon which relief can be granted. *See D & P Constr., Inc. v. Phillipsburg Mall, LLC*, No. A-1965-15, 2017 WL 900008, at *4 (App. Div. Mar. 7, 2017) (affirming the grant of summary judgment dismissing an unjust enrichment claim because "[p]laintiff's contract with Alkyha and Fonesca's testimony support the finding that plaintiff had no expectation of remuneration from defendant when it rendered its services"); *Tyler v. New Brunswick Sch. Dist.*, No. A-2825-06, 2008 WL 238615, at *6 (App. Div. Jan. 30, 2008) ("[W]ith no reasonable expectation of remuneration, plaintiff's unjust enrichment claim against ESC also fails.").

Moreover, a cause of action in quasi-contract for unjust enrichment will not lie where a valid contract exists between the parties. *See Premier Pork L.L.C. v. Westin, Inc.*, No. 07-1661, 2008 WL 724352, at *14 (D.N.J. Mar. 17, 2008) (Rodriguez, J.) ("Quasi-contract liability will not be imposed . . . if an express contract exists concerning the identical subject matter." (citation and internal quotation marks omitted)); *Century 21-Main St. Realty, Inc. v. St. Cecelia's Church*, No. A-2506-15, 2017 WL 3880454, at *5 (App. Div. Sept. 6, 2017) ("If a contract exists between the parties, unjust enrichment is

generally inapplicable."). Notably, Mitlitsky Eggs does not dispute that there was a valid contract between it and CMC—*i.e.* the Mitlitsky-CMC Agreement. (*See* D.E. 53, Answer ¶ 21 (admitting to the terms of the Mitlitsky-CMC Agreement).) Mitlitsky Eggs therefore cannot sustain a claim for unjust enrichment against CMC for this reason as well.[15]

Thus the Court grants CMC's motion to dismiss Count Four of the amended counterclaim.

## IV.    <u>Conclusion</u>

For the foregoing reasons, Mitlitsky's motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) is denied, and CMC's motion to dismiss the amended counterclaim for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6) is granted in part and denied in part. An appropriate order will be entered.

/s/ Katharine S. Hayden

Dated: October 16, 2019                    Katharine S. Hayden, U.S.D.J.

---

[15] Quoting *Goldsmith v. Camden County Surrogate's Office*, 408 N.J. Super. 376, 382 (App. Div. 2009), Mitlitsky Eggs argues that "unjust enrichment may arise outside the usual quasi-contractual setting." In making that statement in *Goldsmith*, the court relied on *County of Essex v. First Union Nat. Bank*, 373 N.J. Super. 543 (App. Div. 2004), *aff'd in part, rev'd in part*, 186 N.J. 46 (2006), in which the court observed that, outside the quasi-contractual setting, "unjust enrichment has been used to deny the wrongdoer any profit from the transaction" "when corrupt means have been employed to obtain a *governmental contract.*" *Id.* at 550 (emphasis added). That is clearly not the case here.